# UNITED STATES COURT OF APPEALS FOR VETERANS CLAIMS

No. 10-1785

Marvin O. Johnson, Appellant,

v.

Eric K. Shinseki,
Secretary of Veterans Affairs, Appellee.

On Appeal from the Board of Veterans' Appeals

(Argued December 8, 2011                       Decided March 27, 2013           )

*Kenneth Carpenter*, of Topeka, Kansas, whom R. Edward Bates, of Naperville, Illinois, was on the brief for the appellant.

*Shanti L. Hageman*, with whom *Will A. Gunn*, General Counsel; *R. Randall Campbell*, Assistant General Counsel; and *Nisha C. Hall*, Deputy Assistant General Counsel, were on the brief, all of Washington, D.C., for the appellee.

Before KASOLD, *Chief Judge*, and HAGEL, MOORMAN, LANCE, DAVIS, SCHOELEN, PIETSCH, and BARTLEY, *Judges*.[1]

SCHOELEN, *Judge*, filed the opinion of the Court. MOORMAN, *Judge*, filed a concurring opinion. KASOLD, *Chief Judge*, filed a dissenting opinion. DAVIS, *Judge*, filed a dissenting opinion in which BARTLEY, *Judge*, joined.

SCHOELEN, *Judge*: Marvin O. Johnson appeals through counsel a May 14, 2010, Board of Veterans' Appeals (Board) decision that denied (1) a disability rating in excess of 10% for rheumatic heart disease, (2) a disability rating in excess of 10% for right knee disability, (3) disability compensation benefits for diabetes mellitus on the basis of exposure to herbicides, and (4) reopening

---

[1] Judge Greenberg did not participate in this matter because it was assigned for a full court decision and conferencing was held prior to his appointment with the Court. *See* Court's Internal Operating Procedures, sec. VII(b)(1)(B).

a claim for disability compensation benefits for hypertension. The Board granted the appellant a separate 10% disability rating for instability of the right knee.[2] The Board also remanded Mr. Johnson's claim for an increased disability rating for a left knee disability and his entitlement to a total disability rating based on individual unemployability (TDIU). Because the Board did not reach a final decision on the remanded matters, the Court has no jurisdiction over them. *See Kirkpatrick v. Nicholson*, 417 F.3d 1361 (Fed. Cir. 2005) (holding that the Court does not have jurisdiction over remanded claims).

Mr. Johnson does not address the Board's denial of his claim for disability compensation benefits for diabetes mellitus or the Board's determination that there was no new and material evidence to reopen a claim for disability compensation for hypertension. Accordingly, Mr. Johnson has abandoned any challenge to the Board's decision regarding these matters and the Court need not address the Board decision with respect to these matters. *Ford v. Gober*, 10 Vet.App. 531, 535-36 (1997) (claims not addressed in appellant's pleadings are considered abandoned).

Although the appellant states that he is appealing the Board's findings that he is not entitled to a disability rating in excess of 10% for right knee instability and an increased schedular rating for right knee disability (degenerative changes), he makes no arguments challenging the Board's determinations regarding the appropriate *schedular* rating for those conditions. Additionally, Mr. Johnson makes no arguments challenging the Board's denial of a schedular rating in excess of 10% for rheumatic heart disease. The Board's determinations in this regard therefore will be affirmed. *See Coker v. Nicholson*, 19 Vet.App. 439, 442 (2006) (stating that an appellant "must plead with some particularity the allegation of error"), *rev'd on other grounds sub nom. Coker v. Peake,* 310 F. App'x 371 (Fed. Cir. 2008) (per curiam order); *Hilkert v. West*, 12 Vet.App. 145, 151 1999 (en banc) (stating that the appellant bears the burden of persuasion on appeal to show Board error).

---

[2] The Board's grant of the separate 10% schedular rating for right knee instability is a favorable finding, which the Court cannot disturb. *See Medrano v. Nicholson*, 21 Vet.App. 165, 170 (2007) ("The Court is not permitted to reverse findings of fact favorable to a claimant made by the Board pursuant to its statutory authority.").

The appellant does contest the Board's determination that he was not entitled to extraschedular rating consideration of his service-connected rheumatic heart disease and right knee disability under 38 C.F.R. § 3.321(b)(1) (2012). In this regard, Mr. Johnson argues that the Board failed to provide an adequate statement of reasons or bases for its conclusions that he is not entitled to a referral for extraschedular consideration for his heart disease and right knee disability on either an individual or on a collective basis. Because the Secretary's interpretation of 38 C.F.R. § 3.321(b)(1) as limiting extraschedular ratings to individual disabilities is not inconsistent with the regulation or otherwise plainly erroneous, and the Board did not commit prejudicial error in its analysis of whether to refer Mr. Johnson's heart and right knee disability for extraschedular consideration on an individual basis, the Board's decision will be affirmed.

## I. BACKGROUND

Mr. Johnson served in the U.S. Army from May 14, 1970, to December 23, 1971. Record (R.) at 846. In March 2008, he filed a claim for increased disability ratings for his service-connected disabilities, including rheumatic heart disease (then rated 10% disabling), and degenerative changes of the right and left knee (each knee then rated 10% disabling). R. at 239.

On March 14, 2008, Mr. Johnson underwent a VA compensation and pension examination of the joints. R. at 220-22. He informed the VA examiner that he had daily, constant pain in both knees. R. at 220. He characterized the pain as an ache that occasionally became sharp, and he noted that the pain was aggravated by walking, bending, climbing stairs, and standing. *Id*. He reported that his knee disability interfered with walking and standing for long periods. *Id*. He took Tylenol for the pain and occasionally used heat, ice, bilateral knee braces, and a cane to alleviate his pain. At the time of the VA examination, Mr. Johnson reported that he was self-employed detailing cars. R. at 221.

The examiner noted mild tenderness medially in the left and right knees. *Id.* Regarding the right knee, the examiner noted that there was no deformity or swelling. R. at 221. There was full extension of the right knee with mild pain, 0 to 105 degrees of flexion with mild pain medially, and no laxity, instability, or crepitus. Range of motion testing did not produce weakness, fatigue, or incoordination, and, with repetitive motion, there was no additional loss of range of motion of the

3

right knee. *Id*. The examiner noted that Mr. Johnson had a normal gait except for a slight limp favoring the right knee. *Id*. X-rays showed mild arthritic changes in the right knee. R. at 222. The examiner diagnosed "[b]ilateral knee degenerative joint disease," noting an impression of "minor degenerative changes in the patellofemoral joints bilaterally." R. at 221-22.

On March 25, 2008, Mr. Johnson underwent a VA heart examination for his service-connected rheumatic heart disease. R. at 217-18. The VA examiner concluded that there was "no evidence of valvular heart disease, nor myocardial disease on physical examination and certainly no symptoms or functional limitation." R. at 218.

On April 18, 2008, a VA regional office (RO) denied Mr. Johnson's claims and concluded that he was not entitled to TDIU. R. at 197-208. Mr. Johnson appealed this decision to the Board. R. at 36. On May 14, 2010, the Board issued the decision here on appeal. R. at 3-25. The Board denied referral for extraschedular consideration of Mr. Johnson's heart disease and right knee disorder.

## II. ANALYSIS

### A. Combination of Disabilities

Mr. Johnson contends that the plain language of the Secretary's regulation regarding extraschedular evaluations requires the Secretary to consider both the disability picture presented by an individual disability and by the service-connected disabilities collectively. In its decision, the Board did not consider Mr. Johnson's entitlement to a referral for extraschedular consideration for his disabilities on a collective basis but determined that Mr. Johnson was not entitled to a referral for extraschedular consideration for either his right knee disability or his rheumatic heart disease individually. The crux of the issue before the Court is whether § 3.321(b)(1) requires VA to consider multiple service-connected disabilities on a collective basis. The Court reviews the interpretation of statutes and regulations de novo. *See* 38 U.S.C. § 7261(a)(1); *Lane v. Principi,* 339 F.3d 1331, 1339 (Fed. Cir. 2003); *Bradley v. Principi,* 22 Vet.App. 280, 290 (2008).

Determining a statute's or a regulation's plain meaning requires examining the specific language at issue and the overall structure of the statute. *Gardner v. Derwinski,* 1 Vet. App. 584, 586 (1991) (citing *Bethesda Hosp. Ass'n v. Bowen,* 485 U.S. 399, 403-05 (1988)), *aff'd sub nom.*

4

*Gardner v. Brown,* 5 F.3d 1456 (Fed. Cir. 1993), *aff'd,* 513 U.S. 115, 118, (1994); *see also Smith v. Brown*, 35 F.3d 1516, 1523 (Fed. Cir. 1994) ("Only by . . . full reference to the context of the whole can the court find the plain meaning of a part."); *Frederick v. Shinseki,* 24 Vet.App. 335, 338 (2011). "On review, if the meaning of the regulation is clear from its language, then that is the 'end if the matter.'" *Tropf v. Nicholson*, 20 Vet.App. 317, 320 (2006) (quoting *Brown v. Gardner*, 513 U.S. at 120).

Under the VA statutory scheme, veterans with disabilities from an injury or disease contracted during active service and in the line of duty are entitled to service-connected disability benefits. 38 U.S.C. § 1110; *see Thun v. Peake,* 22 Vet.App. 111 (2008), *aff'd sub nom. Thun v. Shinseki*, 572 F.3d. 1366 (Fed. Cir. 2009). Under 38 U.S.C. § 501, Congress granted the Secretary general rulemaking authority "to prescribe all rules and regulations which are necessary or appropriate to carry out the laws administered by the Secretary." Additionally, Congress has granted the Secretary authority to adopt and apply a schedule of disability ratings based on the reduction in earning capacity from specific injuries or combination of injuries based on the average impairments of earning capacity resulting from such injuries in civil occupations. *See* 38 U.S.C. § 1155. Pursuant to this authority, the Secretary has established a disability rating schedule that is "used as a guide in the evaluation of disability resulting from all types of diseases and injuries encountered as a result of or incident to military service." 38 C.F.R. § 4.1 (2012).

Once a particular disability has been found to be service connected, VA applies the criteria established in diagnostic codes (DCs) contained in the rating schedule to assign a disability rating that "represent[s] as far as can practicably be determined the average impairment in earning capacity resulting from such diseases and injuries and their  residual conditions in civil occupations." 38 C.F.R. § 4.1; *see also Hunt v. Derwinski,* 1 Vet.App. 292, 296 (1991) (stating that the overall purpose of the statutory and regulatory scheme governing VA compensation law is reflected in the ratings schedule, which rates different mental and physical maladies based upon diminished earning capacity to pay "compensation to veterans when they have, in honorable service to their nation, suffered a loss that is reflected in the decreased ability to earn a living for themselves and their families"); 38 C.F.R. § 3.321(a). The ultimate percentage of a disability rating assigned to a veteran is "considered adequate to compensate for considerable loss of working time from exacerbations or

illnesses proportionate to the severity of the several grades of the disability." 38 C.F.R. § 4.1. Generally, all disabilities, including those arising from "a single disease entity," are rated separately, and then all of the individual ratings are combined using the table provided in 38 C.F.R. § 4.25 (2012). *See Esteban v. Brown*, 6 Vet.App. 259, 261 (1994). It is thus clear under the VA disability compensation system that VA assesses the appropriate schedular disability rating on a disability-by-disability basis. *See Martinak v. Nicholson*, 21 Vet.App. 447, 451 (2007) (stating that the disability rating schedule sets forth the terms and conditions under which disability compensation is to be provided through a list of "[DC]s and rating tables applicable for a specific disease or injury").

It is against this statutory and regulatory framework that VA promulgated 38 C.F.R. § 3.321, which is entitled "General Rating Considerations."[3] Subsection (a) of this regulation reiterates the language of section 1155 and states that the disability rating schedule is used for evaluating, among other things, the "degree of disabilities in claims for disability compensation." That section of the regulation also reiterates that portion of section 1155 that explains that the disability rating schedule

---

[3] 38 C.F.R. § 3.321(a) and (b)(1) provide:

> (a) Use of rating schedule. The 1945 Schedule for Rating Disabilities will be used for evaluating the degree of disabilities in claims for disability compensation, disability and death pension, and in eligibility determinations. The provisions contained in the rating schedule will represent as far as can practicably be determined, the average impairment in earning capacity in civil occupations resulting from disability.

> (b) Exceptional cases--

> > (1) Compensation. Ratings shall be based as far as practicable, upon the average impairments of earning capacity with the additional proviso that the Secretary shall from time to time readjust this schedule of ratings in accordance with experience. To accord justice, therefore, to the exceptional case where the schedular evaluations are found to be inadequate, the Under Secretary for Benefits or the Director, Compensation and Pension Service, upon field station submission, is authorized to approve on the basis of the criteria set forth in this paragraph an extra-schedular evaluation commensurate with the average earning capacity impairment due exclusively to the service-connected disability or disabilities. The governing norm in these exceptional cases is: A finding that the case presents such an exceptional or unusual disability picture with such related factors as marked interference with employment or frequent periods of hospitalization as to render impractical the application of the regular schedular standards.

6

"represents the average impairment in earning capacity in civil occupations resulting from disability." Thus, subsection (a) of the regulation is consistent with the VA disability scheme, in which disability ratings are assigned under the disability rating schedule to individual disabilities. *See Esteban* and *Martinak*, both *supra*.

Subsection (b) is entitled "Exceptional cases." The first sentence of § 3.321(b)(1) reiterates that disability ratings are based upon the average impairment of earning capacity and states that the Secretary shall periodically readjust the disability rating schedule in accordance with experience. The second sentence of subsection (b)(1) states that to "accord justice" to the "exceptional case where the schedular evaluations are found to be inadequate," VA officials (in particular the "Under Secretary of Benefits and the Director, Compensation Service"[4]) are authorized to approve an "extra-schedular evaluation for impairments that are due to service-connected disability or disabilities."

Mr. Johnson argues that the Board must consider referral for and, if referred, the Under Secretary for Benefits or the Director, Compensation Service, must consider awarding, an extraschedular rating based on the combined effect of all service-connected disabilities on a claimant's "average earning capacity." Appellant's Brief (Br.) at 11-12; 38 C.F.R. §3.321(b)(1). His argument appears to be based on the use of the plural nouns in phrases "schedular evaluations" and "disability or disabilities" in subsection (b) (1). The Secretary argues that the use of the plural nouns in phrases "schedular evaluations" and "disability or disabilities" is a recognition that a veteran may receive extraschedular ratings for one or more individual disabilities, and therefore contends that the plain language of the regulation does not require consideration of an extraschedular rating for the combined effect of multiple service-connected disabilities.

The Court concludes, after a careful reading of the regulation, its context within the overall statutory scheme, and consideration of the parties' arguments, that the regulation is subject to competing meanings, and is ambiguous on this point. *See Heino v. Shinseki*, 683 F.3d 1372, 1379

---

[4] The Secretary has advised the Court that, as of April 2011, the title of "Director of Compensation and Pension Service" no longer exists, and that position has since been separated into two distinct positions: "Director of Compensation Service" and "Director of Pension and Fiduciary Service." Secretary's Second Memorandum of Law, n. 1. Because this portion of the regulation and this particular case deal with compensation benefits, the Court will refer to this position as "Director, Compensation Service."

7

(Fed. Cir. 2012) (the structure of a statute can demonstrate that a statute is ambiguous); *Otero-Castro v. Principi*, 16 Vet.App. 375, 380 (2002) ("The basic principles that apply to construing statutes apply equally to construing regulations." (citing *Smith v. Brown,* 35 F.3d at 1523)).  Thus, it is not clear from the language of the regulation whether an extraschedular evaluation is to be awarded solely on a disability-by-disability basis or on the combined effect of a veteran's service-connected disabilities.

It is well established that if the meaning of a regulation is unclear from the language, the Court should defer to the Agency's interpretation of its own regulation so long as it is not inconsistent with the language of the regulation or otherwise plainly erroneous. *Smith v. Nicholson,* 451 F.3d 1344, 1349 (Fed. Cir. 2006) (citing *Auer v. Robbins,* 519 U.S. 452, 461-62  (1997)); *Mason v. Shinseki,* 26 Vet.App. 1, 6 (2012); *Tatum v. Shinseki,* 24 Vet.App. 139, 142 (2010).  The U.S. Supreme Court has held that an agency's interpretation of its own regulations is entitled to substantial deference by the courts.  *See United States v. Cleveland Indians Baseball Co.,* 532 U.S. 200, 202 (2001); *Auer,* 519 U.S. at 461-62; *Thomas Jefferson Univ. v. Shalala,* 512 U.S. 504, 512 (1994); *Martin v. Occupational Safety & Health Review Comm'n,* 499 U.S. 144, 151(1991); *Udall v. Tallman,* 380 U.S. 1, 16 (1965).  This high degree of deference applies even when VA's interpretation of a regulation is first advanced during litigation.  *Reizenstein v. Shinseki*, 583 F.3d 1331, 1335 (Fed. Cir. 2009) (citing *Cathedral Candle Co. v. U.S. Int'l Trade Comm'n*, 400 F.3d 1352, 1364 (Fed. Cir. 2005)).

Further, when a court is interpreting an administrative regulation, it "must necessarily look to the administrative construction of the regulation if the meaning of the words used is in doubt." *Bowles v. Seminole Rock & Sand Co.,* 325 U.S. 410, 414 (1945).  The administrative construction becomes "of controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Id.*; *see also Haas v. Peake*, 525 F.3d 1168, 1186 (Fed. Cir. 2008).  In an effort to demonstrate that he has interpreted the regulation as supporting a disability-by-disability construction, the Secretary cites a provision in the current *VA Adjudication Procedures Manual Rewrite* ( MANUAL M21-1MR), which states that a claim is to be submitted for extraschedular consideration under § 3.321(b)(1) "if the schedular evaluations are considered inadequate for an *individual* disability."  *See* MANUAL M21-1MR, pt. III, subpt. iv, ch. 6, sec. B.5.c  (emphasis added). The Secretary has interpreted his

regulation to apply only to individual disabilities and this interpretation is entitled to substantial deference. Because the regulation here leaves in doubt whether extraschedular consideration may be afforded on a disability-by-disability basis or based on the combined effect of multiple service-connected disabilities, VA is entitled to apply its own construction to the ambiguous regulation.[5] *See Thun*, 572 F.3d at 1369 (deferring to the same M21-1MR provision as an "authoritative interpretation" of § 3.321(b) regarding the RO and Board's authority to reject referral for consideration of an extraschedular rating). This interpretation is entitled to substantial deference. *See Haas, supra* (holding that the court should defer to VA's reasonable interpretation of a regulation that is not inconsistent with the language of the regulation).

Indeed, the Secretary's disability-by-disability interpretation of § 3.321(b)(1) is consistent with the statutory and regulatory scheme. As discussed above, under the VA disability compensation scheme, disability ratings are assigned for each disability separately based on the level of severity and the unique symptoms associated with the particular disability. Section 3.321(b) requires that before an extraschedular evaluation is considered, VA must initially compare the level of severity and the symptoms of a particular service-connected disability with the established criteria found in the rating schedule for that disability. *See* § 3.321(b)(1); *Thun*, 22 Vet.App. at 115. If the rating criteria reasonably describe the claimant's disability level and symptoms, then the veteran's disability picture is contemplated by the rating schedule for that disability, the assigned schedular rating is deemed appropriate, and referral for consideration of an extraschedular rating is not warranted. *Id*. Thus, VA's disability-by-disability approach is consistent with the regulatory language of § 3.321(b)(1) and with the overall disability compensation scheme.

---

[5] One of the dissenting opinions criticizes the Secretary because he chose to have the Deputy Director, of the VA Office of Regulation Policy and Management submit a statement regarding the scope of authority delegated in § 3.321(b), rather than the Under Secretary of Benefits, the Director of the Compensation Service, or the Secretary himself. The majority disagrees with this complaint. It is not for this Court to dictate to the Secretary whether he or an agent, whom he selects, informs the Court of VA's interpretation of § 3.321(b). This is a decision that is fully within the scope of the Secretary's authority and it is not for the Court to question his choice. Anyone who is duly authorized by the Secretary to speak for him does so on his behalf, and should be recognized by the Court as the voice of the Secretary.

Because the VA disability rating schedule is designed to consider the disabling effect of disabilities separately, no single DC provision will adequately assess the variety of symptoms involved with multiple service-connected disabilities. For example, in this case, any rheumatic heart disorder symptoms would per se not be contemplated in the DCs for a knee disability. Thus, when multiple service-connected disabilities are involved, VA would never be able to determine that a veteran's disability picture resulting from all of his service-connected disabilities is adequately contemplated by the standards or criteria found in the rating schedule.

The Secretary's interpretation of § 3.321(b) is also consistent with the regulations governing effective dates. 38 C.F.R. § 3.321(b)(3) specifies how to determine the effective date of an extraschedular rating, providing that "[t]he effective date of these extra-schedular evaluations granting or increasing benefits will be in accordance with § 3.400(b)(1) and (2) as to original and reopened claims and in accordance with § 3.400(o) in claims for increased benefits." Subsections (b)(1) and (2), and (o) of § 3.400 all set an effective date in accordance with events that relate to a single disability claim, such as the date of receipt of the claim. However, a veteran may file separate disability compensation claims for separate conditions at different times, each with its own date of filing. *See Elkins v. Gober*, 229 F.3d 1369, 1375 (2000) ("[T]here is no requirement that a veteran's various claims for relief be simultaneously filed and adjudicated, either upon initial review or on appeal. Rather, we have recognized that the unique statutory process of adjudication through which veterans seek benefits may necessarily require that the different issues or claims of a case be resolved at different times, both by the agency of original jurisdiction and on appeal."). Given that the effective-date provision in subsection (b)(3) specifies how to set an effective date only where an extraschedular evaluation is based on a single-disability claim, it is difficult to conclude that the language of § 3.321(b)(1) clearly contemplates extraschedular consideration on a multiple-disability basis, which may involve multiple claims, or that the Secretary's interpretation of this provision is inconsistent with the overall regulatory and statutory scheme.

After reviewing the language of §3.321(b), the context in which it is applied, and the Secretary's interpretation of § 3.321(b)(1), the Court concludes that the Secretary's interpretation is entitled to substantial deference because it is not unreasonable, plainly erroneous, or inconsistent

10

with the regulation or the statutory and regulatory scheme when viewed as a whole.[6] *See Smith v. Nicholson* and *Tatum,* both *supra.* For these reasons, the Court concludes that the Board was not required to consider whether Mr. Johnson was entitled to referral for extraschedular consideration of his right knee disability and rheumatic heart disease on a collective basis.

## B. Individual Disabilities

Alternatively, Mr. Johnson argues that the Board erred in denying referral for consideration of an extraschedular disability rating for his rheumatic heart disease and right knee disability on an individual-disability basis. App. Br. at 5-10, 12-3. Specifically, he argues that the Board failed to give an adequate statement of reasons or bases for its decision that referral was not warranted. In this regard, he contends that the Board failed to compare "the level of severity and symptomatology of the claimant's individual service-connected disabilit[ies] with the established criteria found in the rating schedule for that disability," as required by § 3.321(b)(1) and step one of *Thun*, *supra*. App. Br. at 7. Regarding step two of *Thun*, he contends that the Board failed to discuss lay statements, which indicated that his disabilities have caused a marked interference with employment. He argues that these deficiencies in the Board's statement of reasons or bases require remand.

The Board is required to provide a written statement of the reasons or bases for its findings and conclusions, adequate to enable an appellant to understand the precise basis for the Board's decision as well as to facilitate review in this Court. 38 U.S.C. § 7104(d)(1); *Allday v. Brown*, 7 Vet.App. 517, 527 (1995); *Gilbert v. Derwinski*, 1 Vet.App. 49, 56-57 (1990). To comply with this requirement, the Board must analyze the credibility and probative value of the evidence, account for the evidence that it finds to be persuasive or unpersuasive, and provide the reasons for its rejection of any material evidence favorable to the claimant. *Caluza v. Brown*, 7 Vet.App. 498, 506 (1995), *aff'd per curiam*, 78 F.3d 604 (Fed. Cir. 1996) (table); *Gilbert*, 1 Vet.App. at 57.

---

[6] Mr. Johson also attempts to bolster his argument by relying on the concurring opinion in *Brambley v. Principi*, 17 Vet.App. 20 (2003) (Steinberg, J., concurring). However, the Court has never adopted Judge Steinberg's concurrence in *Brambley* as the controlling law on this issue, and a concurring opinion is not binding on the Court. *See Maryland v. Wilson*, 519 U.S. 408, 412-13 (explaining that statements in a concurring opinion do not constitute binding precedent).

11

Regarding Mr. Johnson's heart disease, the Board concluded that the record did not demonstrate that his disability picture was so exceptional or unusual as to render impractical the available schedular rating. R. at 15-16. In doing so, the Board pointed out that the medical evidence demonstrates that Mr. Johnson currently has no residuals of heart disease. R. at 16. Additionally, the Board concluded that there is no evidence that Mr. Johnson has any unusual factors such as frequent hospitalizations or marked interference with employment related to his heart disease. *Id.* The Court observes that despite Mr. Johnson's argument that the Board failed to consider his lay statements, he does not point to any lay evidence indicating that he has *any* heart-related symptoms or that his heart disease causes frequent hospitalization or marked interference with employment. *See Hilkert v. West*, 12 Vet.App. 145, 151 (1999) (en banc), *aff'd per curiam*, 232 F.3d 908 (Fed. Cir. 2000) (table) (holding that the appellant bears the burden of demonstrating error on appeal). For these reasons, the Court concludes that Mr. Johnson fails to demonstrate that the Board's reasons or bases for denying referral for extraschedular consideration for heart disease are inadequate. *See Allday, Gilbert, and Caluza*, all *supra*.

Regarding Mr. Johnson's right knee disability, the Board concluded that, under step one of *Thun*, the "symptoms associated with the right knee disorder are reasonably contemplated by the separately assigned 10[%] evaluations for instability and limitation of motion." R. at 16. Further, the Board concluded that, because the record shows that Mr. Johnson has continued to work for a number of years without any evidence that his right knee has caused "marked interference" with employment or frequent hospitalizations, his disability picture is not exceptional or unusual. *Id.* Mr. Johnson is correct that the Board decision does not contain a discussion comparing his disability picture with the criteria in the rating schedules for that disability. 22 Vet.App. at 115. The Board does not discuss whether the rating schedule criteria regarding instability and limitation of flexion or extension reasonably describe Mr. Johnson's right knee disability, which is manifested by difficulty standing and walking for an extended time. Accordingly, the Court finds that the Board's discussion under step one of *Thun* is inadequate.

Nonetheless, the Court finds that the Board's error was harmless. *See* 38 U.S.C. § 7261(b); *Conway v. Principi,* 353 F.3d 1369,1374 (Fed. Cir. 2004)*.* The Board's finding, under step two of *Thun,* that Mr. Johnson's right knee disorder does not present an exceptional disability picture with

12

related factors such as marked interference with employment or frequent hospitalization is clear and permits judicial review. Contrary to Mr. Johnson's contention, the Board considered the lay statements of record regarding the effects of his right knee disability on his employment. The Board described those lay statements in its general discussion of the evidence, and acknowledged in its analysis section addressing extraschedular consideration the July 2009 statements of Mr. Johnson's family members concerning his work capacity. The Board then found, however, that Mr. Johnson was able to maintain employment at two jobs and that there was no evidence in the record indicating that his right knee caused marked interference with that employment. To the extent that Mr. Johnson is concerned that the Board did not discuss potentially relevant lay statements within that portion of the Board's statement specifically addressing extraschedular consideration, there is no requirement that the Board discuss evidence in any particular section of its decision. A Board statement generally should be read as a whole, *Prickett v. Nicholson*, 20 Vet.App. 370, 375 (2006), and if that statement permits an understanding and facilitates judicial review of the material issues of fact and law presented on the record, then it is adequate. *See Allday*, *supra*. The Court finds that the Board decision on appeal, considered in its entirety, meets this standard. Further, Mr. Johnson has not shown that the Board's finding under step two of *Thun* is clearly erroneous based on the record as a whole. Because Mr. Johnson has not established that he has been prejudiced by any error that the Board may have committed in denying him entitlement to referral for consideration of an extraschedular rating for his right knee disability, the Court affirms the Board's decision that an extraschedular rating for Mr. Johnson's right knee disability is not warranted. *See Shinseki v. Sanders*, 556 U.S. 396 (2009).

## C. TDIU Remand

Mr. Johnson's final argument is that the Board should not have adjudicated his entitlement to an extraschedular rating because the record is not complete as to the effect of his service-connected disabilities on his employment. App. Br. at 13-16. Mr. Johnson relies on the Court's decision in *Brambley* to bolster his argument. In *Brambley*, the Board specifically remanded the issue of a rating of TDIU for further development regarding the veteran's employability, but also determined that the record was properly developed on the issue of whether each disability demonstrated a marked interference with employment for purposes of extraschedular evaluation.

13

17 Vet.App. at 24. The Court found that it was difficult to understand how the Board could maintain divergent positions on the completeness of the record. The Court held that because both TDIU and extraschedular consideration required "a complete picture of the appellant's service-connected disabilities and their effect on his employability . . . , it was premature for the Board to decline [referral for] extraschedular consideration where the record was significantly incomplete in a number of relevant areas probative of the issue of employability." *Id*.

Here, the Board did not remand entitlement to a rating of TDIU because the record was incomplete regarding the effect on employability of any of Mr. Johnson's service-connected disabilities for which the Board had denied referral for extraschedular consideration. Instead, the Board remanded the TDIU issue because it had already determined to remand the issue of the appropriate disability rating for left knee disability when, without waiving his right to initial RO consideration of evidence of left knee disability, the appellant submitted new VA treatment records addressing the severity of his left knee disability. The Board concluded that, because the RO's disposition of the left knee could effect the appellant's entitlement to TDIU, a remand was warranted. Because we find lawful VA's practice of considering referral for extraschedular consideration only on the basis of each individual disability, evidence showing the degree of disability for the left knee is not relevant to referral for consideration of an extraschedular rating for the appellant's other service-connected disabilities. This is not a case where the Board reached an inconsistent decision regarding the completeness of the record. Therefore, the Court is not persuaded that the Board erred when it decided Mr. Johnson's entitlement to referral for consideration of extraschedular ratings.

## III. CONCLUSION

After consideration of the appellant's and the Secretary's pleadings, and a review of the record, the Board's May 14, 2010, decision regarding the matters before the Court are AFFIRMED.

MOORMAN, *Judge*, concurring in the result: In agreeing with the majority, I recognize that we are bound by the high degree of deference that the U.S. Court of Appeals for the Federal Circuit (Federal Circuit) traditionally has shown for the Secretary's interpretation of his own regulatory words, even when the interpretation has first been advanced during litigation. *Reizenstein v. Shinseki*, 583 F.3d

1331, 1335 (2009) (citing *Cathedral Candle Co. v. U.S. Int'l Trade Comm'n*, 400 F.3d 1352, 1364 (2005)).  Today, we measure this high degree of deference against a VA regulation that, on its face, appears most easily construed to convey only one meaning–that a veteran's *collective* service-connected disabilities may be considered in determining whether referral for an extraschedular rating is warranted.  The Secretary, however, has offered an alternative meaning for the language in the regulation that is plausible, albeit not obvious; and he provides an affidavit asserting that a future change to the regulation will clarify his offered alternative meaning–i.e., that each of a veteran's disabilities is to be considered separately under § 3.321(b)(1).

Without the Secretary's stated interpretation as to what his words were intended to convey, I believe a remand would have been warranted here based on the Board's failure, in denying referral for an extraschedular rating, to consider the legal standard of 38 C.F.R. § 3.321(b)(1) that sprouts from the otherwise seemingly plain meaning of the language used in the regulation.  This legal standard is whether the appellant's "disability picture" that includes service-connected *disabilities* of both the right and left knees (as well as service-connected heart disease) warranted referral for an extraschedular rating under 38 C.F.R. § 3.321(b)(1) on the basis of his collective service-connected disabilities.

In the absence of the Secretary's recently asserted interpretation, I would apply the simple principle that words have meaning.  And, even in the law and regulations implementing the law, plain words should have plain meanings.  The Secretary, in 38 C.F.R. § 3.321(b)(1) (emphasis added), addresses exceptional cases that require special review in order to "*accord justice*."  These "*cases*," not "claims," are those in which the schedular "*evaluations*" are found to be inadequate.  Under such circumstances, the under secretary for benefits or the director of the compensation service is authorized to approve an extraschedular evaluation commensurate with the average earning capacity impairment due exclusively to the service-connected "*disability or disabilities*."  The Secretary sets forth the governing norm in these exceptional cases: A finding that the "*case*" presents such an exceptional or unusual "*disability picture*" with such related factors as marked interference with employment or frequent periods of hospitalization as to render impractical the application of the regular schedular "*standards*."

15

Clear regulatory statements, plainly expressed, using both singular and plural forms of important words, it seems to me, almost always should be applied as written. This is especially true when the plain language of the regulation leads to a more expansive, and pro-veteran, application of the rule. To do otherwise potentially gives heed not to plain language that favors injured veterans but, rather, to guiding interpretive principles that mirror those enunciated in Lewis Carroll's, *Through the Looking Glass*:

> 'I don't know what you mean by "glory",' Alice said.
>
> Humpty Dumpty smiled contemptuously. 'Of course you don't — till I tell you. I meant "there's a nice knock-down argument for you!"'
>
> 'But "glory" doesn't mean "a nice knock-down argument",' Alice objected.
>
> 'When *I* use a word,' Humpty Dumpty said, in rather a scornful tone, 'it means just what I choose it to mean — neither more nor less.'
>
> 'The question is,' said Alice, 'whether you *can* make words mean so many different things.'
>
> 'The question is,' said Humpty Dumpty, 'which is to be master — that's all.'

LEWIS CARROLL, THROUGH THE LOOKING GLASS, ch. VI (1865), *available at* http://www.gutenberg.org/ebooks/23718.

Although the words of § 3.321(b)(1), on initial review, appeared to me to be clear on their face, I must afford the Secretary deference in the plausible interpretation of his Agency's own regulation. *Smith v. Nicholson*, 451 F.3d 1344, 1349-50 (Fed. Cir. 2006) (stating that the Secretary's interpretation of his own regulations is "'of controlling weight unless it is plainly erroneous or inconsistent with the regulation'" (quoting *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945))); *see Auer v. Robbins*, 519 U.S. 452, 461-62 (1997). I do so based on precedent, despite the fact that the Secretary changed this regulation in 1961 to discuss extraschedular consideration for the veteran's complete "disability picture" and to add the words "or disabilities" where they had not previously appeared. *See* Secretary's Memorandum of Law, Attachment D; Secretary's Second Memorandum of Law, Attachment J. And, I do so despite the fact that the use of the plural "disabilities," following, in a phrase, "disability" and the conjunction "or," in the regulation appears consistent with defining "disability picture" to include both an individual disability and disabilities in the aggregate.

16

Further, I note that the Secretary's offered meaning of the language comes subsequent to this Court's observation in 2003 that "[a]lthough it is well settled that extraschedular consideration [(under § 3.321(b)(1))] and TDIU claims are not necessarily 'inextricably intertwined' . . . here both adjudications require *a complete picture* of the appellant's service-connected disabilities and their effect on his employability." *Brambley v. Principi*, 17 Vet.App. 20, 24 (2003) (citation omitted) (emphasis in original). One Judge specifically noted in *Brambley* that the words of this regulation indicated that multiple disabilities were to be considered in the aggregate when addressing the exceptional case warranting extraschedular consideration:

> [T]he Board erred in its application of the regulation by failing to determine whether the appellant's service-connected disabilities *as a whole* entitled him to extraschedular-rating consideration under § 3.321(b)(1). When VA evaluates a case for extraschedular consideration, the regulation directs the examination of the veteran's "average earning capacity impairment due exclusively to his service-connected disability or *disabilities*."

*Id.* at 26 (Steinberg, J., concurring) (emphasis in original).

The Secretary, thereafter, took no action to amend this regulation to conform to his presently asserted interpretation and intended meaning of these words. Had he paid heed to Judge Steinberg's unambiguous warning concerning the plain meaning of his regulation, the Secretary, during these past 10 years since *Brambley*, could easily have changed the regulation to clarify and reflect his presently asserted meaning. Instead, the Secretary has waited until the present litigation to submit an affidavit asserting that a future change to the regulation will clarify his offered meaning of these words, i.e., that each of a veteran's disabilities is to be considered separately under § 3.321(b)(1) has always been what the Secretary's words were intended to convey.

The Federal Circuit has recently made it abundantly clear that the mere fact that the Secretary has had ample opportunity to revise his regulations to conform to a currently asserted meaning, but did not do so, is of no consequence. In *Walker v. Shinseki*, __ F.3d __, __, No. 2011-7184, slip op. at 12-17, 2013 WL 628429, at *6-7 (Fed. Cir. Feb. 21, 2013), a unanimous panel of that court concluded that a newly asserted interpretation of VA's regulation § 3.303(b) is controlling despite the following circumstances: (1) VA had acquiesced in this Court's interpretation of 38 CFR § 3.303(b) for 15 years; (2) VA had not asserted a contrary meaning to the regulation in its initial

17

briefing of the *Walker* case in either this Court or the Federal Circuit; (3) VA had issued a Notice of Proposed Rulemaking in 2010 (with mandatory review by the Veterans Benefits Administration, VA General Counsel, and the Office of Management and Budget before publication in the Federal Register), which fully embraced this Court's holding with respect to the interpretation of the regulation;[7] (4) VA had not sought to contest that meaning despite application of the same meaning in several precedential decisions since 1997; (5) VA had not contested the Federal Circuit's own use of the same interpretation in *Groves v. Peake*, 524 F.3d 1306, 1309 n.1 (Fed. Cir. 2008); and (6) VA adopted an alternative interpretation only after the Federal Circuit directed additional briefing following oral argument.

Therefore, although VA's interpretation of its regulation may hang on the thinnest thread, Federal Circuit precedent requires deference despite an alternative reading of the regulation that appears clear on its face and favors veterans. This Court, which has a duty to follow the Federal Circuit's precedents in such matters, thus must defer to the Secretary's interpretation in the case now before the Court.

In applying the Federal Circuit's decisions, grounded on U.S. Supreme Court precedent, concerning the deference due to an agency in its interpretation of its own regulations, I reluctantly conclude that the Secretary has presented a plausible, even though strained, alternative reading of § 3.321(b)(1) that warrants an affirmance of the Board's decision. I therefore concur in the majority opinion in this case.

However, this case has caused me to ponder whether special rules of construction should be applied to VA regulations in circumstances such as these. The U.S. Supreme Court has recognized

---

[7]The Secretary's Supplementary Information accompanying the proposed rule stated:

> Proposed § 5.243(d), based on portions of current § 3.303(b), would provide rules for establishing service connection based on the continuity of signs or symptoms. That is, if the chronicity provisions do not apply, VA will grant service connection if there is competent evidence of signs or symptoms of an injury or disease during service or the presumptive period, of continuing signs or symptoms, and of a relationship between the signs or symptoms demonstrated over the years and the veteran's current disability. *See Savage v. Gober*, 10 Vet. App. 488, 498 (1997).

75 Fed. Reg. 53,744, 53,749 (Sept. 1, 2010) (Proposed Rule).

that the statutes affecting veterans benefits should be read and applied in a pro-veteran manner. *See Brown v. Gardner*, 513 U.S. 115, 120 (1994) (ruling against the Government where the statutory text and "reasonable inferences from it" supported the veteran's position); *see also Henderson ex rel. Henderson v. Shinseki*, 131 S. Ct. 1197, 1206 (2011) (stating that the Supreme Court has "long applied 'the canon that provisions for benefits to members of the Armed Services are to be construed in the beneficiaries' favor.'" (quoting *King v. St. Vincent's Hosp.*, 502 U.S. 215, 220-21 n.9 (1991))). Likewise, the Federal Circuit has recognized that "[t]he VA disability compensation system is not meant to be a . . . strategem to deny compensation to a veteran who has a valid claim." *Comer v. Peake*, 552 F.3d 1362, 1369 (Fed. Cir. 2009). I question whether the judicial precedents for reviewing VA's regulations should always result in the same level of deference afforded to the interpretation of such regulations promulgated by agencies charged with regulating business practices, intellectual property, or international trade. After all, VA serves a purpose unique among Federal agencies, characterized by the legal duty to assist its claimants in perfecting their just claims, supported by legislation requiring that the benefit of the doubt must be given to such claimants, and further undergirded by a uniquely pro-veteran, nonadversarial agency process. *See Shinseki v. Sanders*, 556 U.S. 396, 412 (2009) ("Congress has made clear that the VA is not an ordinary agency."). Perhaps VA, as an agency whose mission statement is etched in stone at the Lincoln Memorial and was formulated as part of President Lincoln's Second Inaugural Address: "to care for him who shall have borne the battle and for his widow, and his orphan,"[8] should, in this case, be afforded a less strict level of judicial deference.[9]

That VA's regulations generally are confusing, not well organized, and in dire need of reformulation is reflected in the declaration accompanying the appellee's June 15, 2012, memorandum of law in the instant case. This case, indeed many of the cases decided by this Court,

---

[8]In 1959, these words became VA's motto and were etched on plaques which flank the main entrance to VA's headquarters in Washington, DC.

[9]I further note that many of VA's regulations were drafted at a time when they were not subject to judicial scrutiny in any form. *See Gardner*, 513 U.S. at 122. Also, the Supreme Court recently articulated a lower standard of deference, aptly observing that, "[o]ur practice of deferring to an agency's interpretation of its own ambiguous regulations undoubtedly has important advantages, but this practice also creates a risk that agencies will promulgate vague and open-ended regulations that they can later interpret as they see fit." *Christopher v. Smithkline Beecham Corporation*, 132 S.Ct. 2156, 2168 (2012).

makes manifest the need for clearly written regulations. The sooner such clarification is provided, the sooner veterans and their families, the courts, and VA will no longer need to defer to the "intended meaning" of regulations that were written and then modified decades before judicial review. I look forward to that day.

KASOLD, *Chief Judge*, dissenting: With great respect for my colleagues in the majority, two of their conclusions are simply wrong, with one such conclusion having significant adverse effect on veterans and the VA claims process. The first and foremost error is the majority's finding of ambiguity in a clear regulation based solely on an assertion of ambiguity in the briefing and arguments presented by the counsel to the Secretary, which causes the majority to effectively defer to the redrafting of an otherwise clear regulation, under the guise of interpretation. The second error is the majority's apparent holding that to be adequate the Board's statement must follow a prescribed order of discussion; although the holding is nonconsequential to the result in this case because the majority find no prejudice, it is worth noting that as a matter of law it is simply wrong.[10]

## I. FIRST ERRONEOUS CONCLUSION

### *Overview*

At the outset, an overview of the issue and how it is presented, as well as what is not at issue, is warranted. The Secretary has established a rating schedule with assigned disability ratings that the RO and Board may award to veterans with disabilities based generally on the degree of disability and the effect it has on a veteran's earning capacity, but based sometimes on other factors such as effect on social functioning or effect on daily activities. *Hensley v. Brown*, 5 Vet.App. 155, 162 (1993) ("VA's rating schedule is constructed for the purpose of establishing levels of disability for compensation purposes based upon 'average impairment in earning capacity' resulting from particular injuries or diseases." (quoting 38 U.S.C. § 1155)); *see also* 38 C.F.R. § 4.1 (2012) ("The percentage

---

[10] I also note that the majority gratuitously and favorably cite *Medrano v. Nicholson*, 21 Vet.App. 165, 170 (2007) in note 1, *ante* at *2*, for the proposition that the Court "cannot disturb" a finding favorable to a veteran. Although *Medrano* is quoted correctly, the concept that the Court "cannot disturb" a favorable finding is dictum, and appears to misstate the law. The plain language of 38 U.S.C. § 7261(a)(3) authorizes the Court to "set aside . . . findings (other than those described in clause (4) of this subsection," i.e., "findings of material fact *adverse to the claimant*") that are, inter alia, "arbitrary, capricious," "contrary to constitutional right," "in excess of statutory jurisdiction," or "without observance of procedure required by law." 38 U.S.C.§ 7261 (emphasis added).

20

ratings represent as far as can practicably be determined the average impairment in earning capacity resulting from such diseases and injuries and their residual conditions in civil occupations."); *compare* 38 C.F.R. § 4.130, DC 9411 (2012) (evaluating PTSD based upon "[o]ccupational and social impairment"), *with* 38 C.F.R. § 4.88b, DC 6354 (2012) (evaluating chronic fatigue syndrome based upon the degree to which fatigue "restricts routine daily activities").

Also, to accord justice in exceptional cases where there are unusual factors present and the rating schedule does not adequately address an individual's earning capacity impairment due to disability, the Secretary has authorized the under secretary for benefits (USB) or the director of the compensation and pension service (Director), to award an extraschedular rating. 38 C.F.R. § 3.321(b) (2012). Neither the RO nor the Board is authorized to award an extraschedular rating. Rather, the RO and Board are tasked with determining whether such a rating *might* be warranted, such that referral for USB or Director consideration is warranted. For purposes of our review, the Board is required to address such possible referral whenever the issue is raised by a veteran or otherwise reasonably raised by the record, and, if referral is denied, to provide reasons or bases for denying such referral. *See Gutierrez v. Principi*, 19 Vet.App. 1, 9 (2004) (Board's reasoning flawed when it fails to discuss adequately evidence in support of claim); *Thompson v. Gober*, 14 Vet.App. 187, 188 (2000) (Board must provide an adequate statement of reasons or bases "for its rejection of any material evidence favorable to the claimant"); *Pond v. West*, 12 Vet.App. 341, 347 (1999) (Board is required to develop all issues reasonably raised below); *Talbert v. Brown*, 7 Vet.App. 352, 356 (1995) (noting that the Board must address reasonably raised issues and is not obligated to "conduct an exercise in prognostication").

There is no dispute as to the Board's obligation to evaluate whether referral for extraschedular consideration is warranted with regard to an individual disability. Rather, the issue is whether the Board has a duty to consider and address possible referral for extraschedular consideration when the total disability picture of the veteran – a disability picture based on all of a veteran's disabilities and the combined effect they have on employability and earnings capacity – is exceptional or unusual and is not contemplated by the rating schedule's focus on average earning capacity impairment for each individual disability.

The Secretary's counsel acknowledges that the Secretary has the legal authority to authorize an extraschedular disability rating based on the complete disability picture of a veteran, but counsel argues that the Secretary has not done so. Rather, counsel argues that the Secretary has delegated to the USB and Director the authority to award an extraschedular disability rating *only* for *each* individual disability, based on the limited disability picture associated with the effects of that disability on a veteran's employment and earnings ability. Otherwise stated, the Secretary's counsel argues that neither the USB nor the Director may award an extraschedular disability rating based on a veteran's total disability picture. Accordingly, the Secretary's counsel argues that there is no reason for the Board to consider and address possible referral for an extraschedular disability rating based on the veteran's total disability picture, and therefore there is no error.

Significantly, the issue is not whether the USB or Director *should have awarded* an extraschedular disability rating on the veteran's complete disability picture based on all disabilities and the combined effect they have on employability and earnings capacity. Rather, the issue is whether the USB or Director *even have the authority* to make such an award; if yes, then remand is required so that the Board may address the issue. As discussed below, pursuant to the plain language of § 3.321(b), the USB and Director have the authority,[11] and the Board erred by not discussing whether Mr. Johnson's claim should have been remanded for further development of possible entitlement to an extraschedular disability rating on a collective-disability basis.

### *Saying Something is Ambiguous Does not Make it So*

Although counsel for the Secretary argues that § 3.321(b) is ambiguous, and his argument is cause for serious review, simply saying something is ambiguous does not make it so. *See Tropf v. Nicholson*, 20 Vet.App. 317, 321 n.1 (2006) ("[A] regulation is not ambiguous merely because the Secretary takes a litigation position that contradicts the plain language of the regulation."); *see also Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 130 S. Ct. 1758, 1769 n.7 (2010) ("[M]erely saying something is so does not make it so . . . ."). As discussed below, the plain wording

---

[11] Tellingly, counsel for the Secretary did not submit a statement from the USB or the Director, or the Secretary for that matter, regarding the scope of authority delegated in § 3.321(b). For whatever reason, the only statement submitted is one from the deputy director of the Office of Regulation Policy and Management for the Department of Veterans Affairs (Deputy Director) – the person responsible for redrafting the regulations. *See also infra* note 4.

and promulgating history of the regulation clearly reflect the Secretary's delegation of authority to award an extraschedular rating based on a veteran's total disability picture arising from multiple disabilities. Moreover, counsel for the Secretary fails in his multiple assertions to explain why the regulation should be interpreted as limiting the authority of the USB and Director to award an extraschedular rating based on a veteran's complete disability picture.

I also note that although a majority of the Court find ambiguity in § 3.321(b), or at least accept the argument of counsel to the Secretary that there is ambiguity, their numbers and acquiescence do not mean that the regulation is ambiguous. If it were so, Hans Christian Andersen's "The Emperor's New Clothes"[12] never would have gained the renown it has acquired, and appellate decisions finding ambiguity would never be reversed by the Supreme Court. *See, e.g.*, *Chem. Mfrs. Ass'n v. Natural Res. Defense Council, Inc.*, 470 U.S. 116, 124-25 (1985) (reversing the finding of the U.S. Court of Appeals for the Fourth Circuit that an amendment to the Clean Water Act was ambiguous); *Smith v. Illinois*, 469 U.S. 91, 91 (1984) (reversing the Illinois Supreme Court's finding that the defendant's responses to continued police questioning rendered his initial request for counsel ambiguous).

Moreover, although Lewis Carroll's Humpty Dumpty might define words as he wishes in *Through the Looking Glass*, the words in our laws and regulations are given their contextual, ordinary meaning. *See, e.g.*, *Brown v. Gardner*, 513 U.S. 115, 118 (1994) ("Ambiguity is a creature not of definitional possibilities but of statutory [or regulatory] context."); *Tropf*, 20 Vet.App. at 321 n.1 ("[A] statute is ambiguous only when the application of the ordinary meaning of words and rules of construction to the plain language of the regulation fails to answer the question at issue."); *see also United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 371 (1988) (stating that "[a] provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme – because the same terminology is used elsewhere in a context that makes

---

[12]  Although a children's story, "The Emperor's New Clothes" – which involves an emperor and many of his citizens being talked into believing he was wearing a beautiful new set of clothes, when he wore none at all – is well cited as an example of people believing something to be fact that is not. *See, e.g.*, *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfittesr, Inc.*, 280 F.3d 619, 631 (6th Cir. 2002) (using "Emperor's New Clothes" analogy); *see also* HANS CHRISTIAN ANDERSEN, THE COMPLETE ANDERSEN (Jean Hersholt trans., Heritage Press 1949), *available at* http://www.anderson.sdu.dk/vaerk/hershold/TheEmperorsNewClothes_e.html.

its meaning clear or because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law" (citations omitted)); *Gardner v. Derwinski*, 1 Vet.App. 584, 586 (1991) ("Determining a statute's plain meaning requires examining the specific language at issue and the overall structure of the statute." (citing *Bethesda Hosp. Ass'n v. Bowen*, 485 U.S. 399, 403-05 (1988))), *aff'd sub nom. Gardner v. Brown*, 5 F.3d 1456 (Fed. Cir.), *aff'd*, 513 U.S. 115 (1994).

### *The Regulation's Plain Language*

Substantial deference is granted to the Secretary's interpretation of his own regulation so long as it is not "plainly erroneous or inconsistent with the regulation." *Auer v. Robbins*, 519 U.S. 452, 461 (1997); *see also Smith v.Nicholson*, 451 F.3d 1344, 1349-50 (Fed. Cir. 2006) (citing *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945)).

The regulation governing extraschedular consideration reads, in pertinent part:

> *To accord justice*, therefore, to the exceptional case where the *schedular evaluations* are found to be inadequate, the Under Secretary for Benefits or the Director, Compensation and Pension Service, upon field station submission, is authorized to approve on the basis of the criteria set forth in this paragraph *an extra-schedular evaluation* commensurate with the average earning capacity impairment due exclusively to *the* service connected disability *or disabilities*. The governing norm in these exceptional cases is: A finding that *the case* presents such an exceptional or unusual *disability picture* with such related factors as marked interference with employment or frequent periods of hospitalization as to render impractical the application of the regular schedular standards.

38 C.F.R. § 3.321(b)(1) (emphasis added).

Rather than addressing the situation where "a schedular evaluation" is inadequate, which would indicate a focus on each disability evaluation independently, the regulation addresses the plural situation where "the schedular evaluations" are inadequate, which can encompass an individual disability evaluation as well as multiple disability evaluations. *Id.* Similarly, rather than limiting the criteria for an extraschedular evaluation to the exceptional case where an *individual disability* causes earnings impairment beyond the average impairment, the regulation explicitly notes that an extraschedular evaluation is to be based on earnings impairment beyond average caused by

"disability or disabilities," which clearly contemplates overall impairment caused by the disabilities individually as well as collectively.

Tellingly, the regulation authorizes "*an* "extraschedular" *evaluation*" which, in the context of the schedular *evaluations* being inadequate and the extraschedular *evaluation* being based on the earnings impairment due to *disability or disabilities*, reflects that the extraschedular *evaluation* can be done on an individual or composite disability basis. Also, the governing norm for considering whether an extraschedular evaluation should be awarded is predicated on the exceptional or unusual *disability picture* of the veteran, which, in the context of determining earnings impairment due to *disability or disabilities* certainly envisions the veteran's *complete* disability picture, whether due to one disability or multiple disabilities.

Additionally, the predicate for authorizing an extraschedular evaluation is "[t]o accord justice." Although the Secretary could have accorded justice only on a disability-by-disability basis, the language of the sentence containing this phrase, as well as the language of the entire regulation, does not support such a limiting interpretation, which also would be inconsistent with the broad concept of according justice. For example, under the regulation, a service-connected right-hip, right-knee, and right-ankle disability assessed individually, might not affect employment on an individual disability basis beyond the degree envisioned by the individual disability ratings, but – when viewed collectively – the disabilities might significantly affect employment. Nothing in the Secretary's regulation limits extraschedular consideration to a disability-by-disability assessment; indeed, the regulation states the opposite. Moreover, inasmuch as the Secretary has broad authority to issue regulations, 38 U.S.C. § 501, there was no need to cite "justice" as the basis for authorizing an extraschedular evaluation unless the delegation was intended to be broad, and there is no reason to twist the interpretation of "justice" as only permitting an extraschedular evaluation on a limited, individual-disability basis. If the Secretary wanted to limit the criteria for an extraschedular evaluation to a disability picture associated with only a single, individual disability he could have done so; he did not, and has not yet done so.[13]

---

[13] The Deputy Director filed a statement with the Secretary's first supplemental memoranda. The Deputy Director's statement reflects that official's understanding of a longstanding interpretation that extraschedular evaluation was limited to an individual disability assessment and that official's current effort to change the regulation to make it clear

25

Although counsel for the Secretary argues that the regulation's reference to "disability or disabilities" connotes extraschedular evaluation for one or more individual disabilities as opposed to an evaluation based on the collective effect of multiple disabilities, such an interpretation ascribes a degree of redundancy to the regulation – and such a constrained view of "accord[ing] justice" – that it would be contrary to the well-established rule that effect must be given to all words expressed in legislation and regulation. *Roper v. Nicholson*, 20 Vet.App. 173, 178 (2006) (holding that "the VA statutory and regulatory scheme 'should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant, and so that one section will not destroy another unless the provision is the result of obvious mistake or error'" (quoting 2A N. SINGER, SUTHERLAND ON STATUTORY CONSTRUCTION, § 46:06 (6th ed. 2000))); *see also King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 (1991) (holding that, when interpreting a statute or regulation, the court is required to look at the context and provisions of law as a whole); *Imazio Nursery, Inc. v. Dania Greenhouses*, 69 F.3d 1560, 1564 (Fed. Cir. 1995) (holding that all parts of a statute must be construed together without according undue importance to a single or isolated portion); *Smith v. Brown*, 35 F.3d 1516, 1523 (Fed. Cir. 1994) (the canons of statutory interpretation apply to interpreting regulations).

It is worth reiterating that the interpretation recently proffered by counsel for the Secretary *limits* the authority of the USB or Director, each of whom has been delegated authority in § 3.321(b)(1) to render extraschedular evaluation decisions. *See also* 38 U.S.C. § 512(a) (giving Secretary broad authority to delegate authority to act); *Parrish v. Shinseki*, 24 Vet.App. 391, 396 (2011) (recognizing Secretary's broad authority to delegate authority to act); 38 C.F.R. § 3.100(a) (delegating general authority to the USB to act on matters within the jurisdiction of the Veterans

---

that the USB and Director do not have the authority to grant an extraschedular evaluation on a multiple disability basis. Although I do not question the Deputy Director's understanding of the interpretation of the regulation and how it might have been interpreted over time, it is the opinion of the USB, Director, or general counsel, or evidence of a consistent application of that interpretation, that should have been provided, and is notably absent. *Cf. Amanfi v. Ashcroft*, 328 F.3d 719, 720 (noting that the Attorney General is statutorily the ultimate authority on interpretations of the Immigration and Nationality Act (citing 8 U.S.C. § 1103)); *Vons Cos. v. United States*, 51 Fed. Cl. 1, 21 (2001) (stating that the "court [should be] extraordinarily hesitant to attribute to the IRS or the Treasury Department interpretations of a revenue ruling made by individual IRS employees that represent their personal views, rather than the official position of the agency"). Of equal note, although the Secretary certainly has the authority to change his regulation, no substantive change has taken place over the past half-century, and, is now only taking place as a result of today's majority decision.

Benefit Administration). To be sure, neither the USB nor the Director is required to grant an extraschedular evaluation simply because a veteran has multiple disabilities – indeed, extraschedular evaluation is for the exceptional or unusual case – but there equally is nothing in the regulation that limits their authority to grant an extraschedular evaluation based only on a disability-by-disability basis. As indicated above, if the Secretary wanted to limit the authority of the USB or the Director, he could have done so – and still can; but, he has not.[14]

### Promulgating History

Although the plain meaning of the regulatory language is clear and binding, counsel for the Secretary suggests that the regulation's promulgating history supports the interpretation that the authority delegated to the USB and Director is limited in scope. To the contrary, however, the promulgating history supports the plain language of the regulation that the USB and Director have been delegated broad authority to award an extraschedular disability rating based on the total disability picture of the veteran.

Based on the Secretary's supplemental memoranda, the regulation has its roots in a 1930 rule, Rule 1142. Secretary's Supplemental (Sec. Supp.) Br. at App'x A (cited by the Secretary as VA Rules and Procedure § 1307 (May 19, 1930)). The language therein is unclear – ambiguous – as to whether an extraschedular disability rating could be predicated on a multiple-disability basis, because the rule simply indicates that such a rating would be based on the reduction in average earning capacity compared to the average worker "suffering a similar disability," which envisions either a single disability or multiple disabilities.

VA regulations from 1934, however, strongly indicate that an extraschedular evaluation was permissible based on multiple disabilities. Specifically, VA Regulation No. 3 primarily addressed total disability ratings and clearly authorized such ratings based on total disability arising from a single disability or multiple disabilities. Sec. 2d Supp. Br. at App'x G (cited by the Secretary as

---

[14] Noting that the Secretary has not limited the authority of the USB or Director is not a suggestion that he should do so. Indeed, upon issuance of today's decision, the Secretary promptly should change the position espoused by his counsel and ensure that veterans suffering from multiple disabilities and a combined effect beyond that associated with each individual disability are considered for an extraschedular rating based on the collective disability effect on their employability and earnings capacity. Our veterans's sacrifices demand no less from a grateful Nation.

27

Veterans Regulation No. 3(a) on VA Rules and Procedures § 1307) ("The rule . . . permit[s] ratings of total disability . . . when the disabled person . . . has been unable, by reason of impairment of mind or body, to follow substantially gainful occupation, provided that his physical or mental *disabilities* are deemed by the rating agency to be sufficiently severe to produce this occupational incapacity" (emphasis added))). Pertinent hereto, this same regulation explicitly authorized submission of meritorious cases for consideration of an extraschedular rating when the case did not qualify for a total disability rating under the rating schedule or Regulation No. 3. Inasmuch as Regulation No. 3 addressed a total disability rating predicated on either a single- or collective-disability basis, it is disingenuous for the Secretary's counsel to argue that this regulation authorized referral for extraschedular consideration of cases (that did not qualify for a total disability rating) only on an individual-disability basis.

Revisions reflected in the 1936 VA version of VA Rules and Procedures § 1142 also indicate that an extraschedular evaluation could be predicated on multiple disabilities, and it certainly contains no limitation against such a rating. Specifically, the rule provides that, if the general rating schedule was deemed inadequate, the matter could be forwarded for an advisory opinion or reevaluation. Of note, the forwarded submission was to include a recommendation and "evaluation of every disability." Sec. Supp. Br. at App'x B (cited by the Secretary as VA Rules and Procedure § 1142 (Jan. 25, 1936)). A 1945 VA rule also provides the same general guidance that, if the rating schedule is deemed inadequate, a claim may be forwarded for an advisory opinion or reevaluation, although the 1945 rule does not contain the guidance stated in the 1936 rule as to what should be included in the forwarded submission. Sec. Supp. Br. at App'x C (cited by the Secretary as VA Regulation § 1142(A) (Oct. 19, 1949) [sic]).

In 1960, an interim regulation was issued that provided, inter alia, effective dates for an extraschedular evaluation, tied to the date of the claim or the facts of the case. Although the Secretary's briefing suggests that this supports an interpretation that extraschedular consideration is predicated only on a single-disability basis, the suggested support is illusive, at best. Whether predicated on a claim for one disability or multiple disabilities, or predicated on a disability recently found to be service connected for a veteran already service connected for one or more disabilities, the effective date of an extraschedular evaluation is tied to the date of the earliest claim still open

28

or the facts found, similar to the effective date for the award of a total disability rating based on individual unemployability (TDIU). 38 U.S.C. § 5110(a) ("[T]he effective date of an award . . . shall be fixed in accordance with the facts found, but shall not be earlier than the date of receipt of application therefor."). Otherwise stated, how an effective date is determined sheds no light on whether the USB or Director has the authority to grant an extraschedular evaluation on only a single-disability basis or a cumulative-disability basis. Sec. 2d Supp. Br. at App'x H (cited by the Secretary as VA Emergency Interim Issue, EM 21-58 (June 17, 1960)).

By 1961, VA had codified its regulations and implemented VA Regulation 1321, a version of § 3.321 substantially similar to its current form. Here, any ambiguity present in the earlier VA rules is gone. Though not precluded earlier, by 1961 it became clear that an extraschedular evaluation could be granted "commensurate with the average earning capacity impairment due exclusively to the service connected *disability or disabilities*." *Id.* (emphasis added). An explanation associated with the regulatory changes made to several regulations in 1961 notes that most regulatory changes were nonsubstantive, *except* for the changes to Regulations 1353 and *1321*, which were "substantive." Sec. 2d Supp. Br. at App'x J (cited by the Secretary as VA Regulation 1321 (§ 3.321) (1961)). Although the specific substantive changes were not further detailed, the addition of "or disabilities" in the context of generally ambiguous rules in the past, and in the context of substantive changes being made speaks volumes. *Id.*

In sum, the regulation's promulgating history supports the plain language of the regulation that the USB and Director have been delegated broad authority to award an extraschedular disability rating based on the total disability picture of the veteran. *See Hamdan v. Rumsfeld*, 548 U.S. 557, 580 n.10 (2006) (noting that the Court's interpretation of the plain language of a statute is supported by the legislative history); *Lamie v. U.S. Trustee*, 540 U.S. 526, 539 (2004) (noting that "history and policy considerations lend support" to Court's holding regarding the plain language of a statute).

*VA Adjudication Procedures Manual*

The Secretary's briefing notes that the *VA Adjudication Procedures Manual* (M21-1MR) states that a claim is to be submitted for extraschedular consideration under "38 C.F.R. § 3.321(b)(1) if the schedular evaluations are considered to be inadequate for an *individual disability*" (emphasis

added), and the briefing contends that this phrasing reflects an interpretation that § 3.321(b)(1) prohibits extraschedular consideration based on multiple disabilities. M21-1MR, pt. III, subpt. iv, ch. 6, sec. B(5)(c) (cited by the Secretary in Sec. Supp. Br. at App'x G). However, reading M21-1MR as limiting the criteria for extraschedular consideration to only those instances where the schedular evaluations are inadequate for an individual disability would result in M21-1MR trumping the plainly established broader criteria in the regulation that is not subject to being trumped by the M21-1MR. *See Smith v. Shinseki*, 647 F.3d 1380, 1385 (Fed. Cir. 2011) ("VA interpretations of its own regulations in its Adjudication Procedures Manual [M21-1] are 'controlling' as long as they are not 'plainly erroneous or inconsistent with the regulation.'" (quoting *Thun v. Shinseki*, 572 F.3d 1366, 1369 (Fed. Cir. 2009) (quoting *Auer*, 519 U.S. at 461)); *Castellano v. Shinseki*, 25 Vet.App. 146, 151-52 (2011) (holding that "a properly promulgated regulation trumps an M21-1 provision or other VA directive that plainly is erroneous or inconsistent with regulation").

Moreover, although this instructional manual directs referral for extraschedular consideration when the rating schedule is inadequate to rate an individual disability, it does not preclude referral for extraschedular consideration based on the veteran's collective disabilities. Indeed, in a preceding section, the manual directs rating officials to "consider" possible entitlement to an extraschedular evaluation when, inter alia, the evidence indicates "the rating schedule may be inadequate to compensate for the average impairment of earning capacity due to *disability* (for example, marked interference with employment or frequent periods of hospitalization)." M21-1MR, pt. III, subpt. iv, sec. 6.B(10)(a) (emphasis added). There is no indication that "disability" is limited to an individual disability, which would be the case if "*a* disability" had been used instead of "disability." There also is no indication that rating officials should not forward a claim for extraschedular consideration based on evidence that the rating schedule is inadequate for a disability picture resulting from multiple disabilities.

Read together, these two provisions indicate that the rating official *must* submit a claim for extraschedular consideration when the rating schedule is inadequate for an individual disability, but *may* also submit a claim for extraschedular consideration whenever the rating schedule is inadequate to compensate the veteran as a result of "disability," which can consist of multiple disabilities.

Thus, even if § 3.321(b) were ambiguous, the M21-1 does not reflect an interpretation that the USB or Director lack the authority under § 3.321(b) to award an extraschedular evaluation on a combined disability basis.

In sum, the M21-1MR not only cannot trump the plain language of a regulation, it does not even conflict with the regulation here. *Castellano*, *supra*; *cf*. *Talley v. Derwinski*, 2 Vet.App. 282, 287 (1992) (holding that, just as statutes should be construed to sustain constitutionality, regulations should be construed to harmonize with the law).

### *VA Practice*

The Secretary's briefing notes an inability to confirm a consistent Agency practice regarding this issue, which – he asserts – reflects a lack of authority in the USB or Director to award an extraschedular evaluation on a multiple-disability basis. The briefing speculates that some Board decisions might have considered referral in such a context, although no officials contacted by counsel for the Secretary recall a decision granting such a rating. Moreover, none of the key officials, i.e., the Secretary, USB, or Director, has submitted a statement regarding the scope of authority believed to have been delegated in § 3.321(b) when first promulgated in its current form in 1961. The Secretary also has not presented a VA Office of General Counsel interpretation supporting the view represented in his counsel's briefing.

Rather, the deputy director of the Office of Regulation Policy and Management for the Department of Veterans Affairs submitted a statement to the effect that he understands that delegation of authority to award an extraschedular evaluation on a multiple-disability basis was not the intent behind § 3.321(b), and he is working on a rewrite of the regulation to make it clear that an extraschedular evaluation on a multiple-disability basis is not authorized. With due respect, the statement submitted is more persuasive of an effort to try and change the regulation (unsuccessfully to date, *see supra* note 4) than to clarify it, and, in any event, is not persuasive in light of the regulation's plain language, and the other factors discussed throughout my dissent.

31

Similarly, even assuming arguendo that there is a "current" practice of excluding extraschedular consideration for veterans with earnings impairment due to collective disabilities, such a practice cannot serve to change a regulation where the regulation plainly states the opposite. There are specific publication and opportunity-to-be-heard requirements associated with modifying a regulation. 38 U.S.C. § 501 (VA rulemaking authority); *see also* 5 U.S.C. § 553(b) and (c) (expounding upon specific publication and opportunity-to-be-heard requirements associated with modifying a regulation). Until such proper modification is undertaken, the regulation plainly authorizes extraschedular consideration on the total disability picture arising from all of a veteran's disabilities.

A proper analysis of § 3.321(b) and any VA practice also must keep in perspective the fact that the authority delegated in § 3.321(b) to the USB or Director is intended to be exercised in the exceptional case – where there is an exceptional or unusual disability picture such that the general rating schedule is inadequate to compensate for the average earning capacity impairment due to the disability or disabilities. Accordingly, the lack of a current practice or recollection of awarding extraschedular consideration for collective disabilities might be a result of the fact that exceptional cases are by definition rare.

Thus, in the context of extraschedular evaluation intended for the exceptional or unusual case, VA practice in actually awarding an extraschedular evaluation, whatever it might be, is not very helpful in trying to determine the scope of § 3.321(b) and whether it includes authority for the USB or Director to grant an extraschedular rating to a veteran suffering from multiple disabilities that might individually be adequately contemplated by the general rating schedule, but collectively result in a disability picture that fails to adequately compensate for the average earning capacity impairment due to those disabilities. Accordingly, the contention of Secretary's counsel in his briefing that the Secretary's practice reflects a grant of authority in § 3.321(b) limited solely to individual-disability consideration is not persuasive.

### *Judicial Sanction*

The Secretary's briefing also argues that this Court has sanctioned a practice of the Board referring cases for extraschedular consideration based only on earnings impairment due to a single

disability, because the word "disability" – and not "disabilities" – was used in *Thun*, 22 Vet.App. at 115. The briefing also suggests that *Thun*'s identification of a three-step analysis for determining whether referral for extraschedular consideration is warranted indicates that such consideration is limited to individual-disability evaluation. These arguments are misplaced; *Thun* involved a single disability, and the issue of whether § 3.321(b)(1) envisions potential awards of extraschedular consideration based on cumulative disabilities that was not before, and not addressed by, the Court in *Thun*.

Moreover, although counsel for the Secretary and the majority are correct that the Court has never explicitly adopted the view expressed by Judge Steinberg in his separate statement in *Brambley v. Principi*, 17 Vet.App. 20, 24 (2003) (noting that § 3.321(b)(1) envisions extraschedular consideration on a cumulative-disabilities basis), the Court has never expressed disagreement with it either. Indeed, the majority in *Brambley* expressed no disagreement with Judge Steinberg's view, and, in fact, noted that an extraschedular-evaluation adjudication, like an adjudication for TDIU, "require[s] a complete picture of the appellant's service-connected disabilities and their effect on his employability." 17 Vet.App. at 26. Also, in *Vazquez-Flores v. Shinseki*, 24 Vet.App. 94, 108 (2010), in the context of not finding Board error as to denial of referral for extraschedular consideration for an individual disability, the Court remanded that matter because the Board had erred in denying service connection for another disability. Although not explicitly stated, the action taken in *Vazquez-Flores* indicates an understanding that, if the second disability were granted service connection on remand, consideration of an extraschedular evaluation might be warranted based on both disabilities, and remand on that issue also was warranted so the Board could address it as needed.

Regardless of the lack of explicit caselaw on the issue, it is clear that when a claimant requests referral for an extraschedular evaluation, or the record evidence reasonably raises possible entitlement to such referral, the Board is required to address whether referral for an extraschedular evaulation is warranted on both an individual- and collective-disability basis, and, if not referred, provide the reasons or bases for the non-referral decision.

*Inability to Implement*

The Secretary's briefing also asserts an inability to implement extraschedular evaluation consideration on a multiple-disability basis, but this argument is perplexing. The Secretary routinely adjudicates possible entitlement to TDIU, whether predicated on an individual -or collective-disability basis. There is no reason why he cannot do so for extraschedular evaluation.

Indeed, the Court has noted the similarities in the two evaluations and the fact that both are predicated on a complete picture of a veteran's service-connected disabilities and their effect on employment. *See Brambley*, 17 Vet.App. at 24. *Compare* 38 C.F.R. § 4.16 (2012) (TDIU predicated on inability "to secure or follow a substantially gainful occupation"), *with* § 3.321 (extraschedular consideration authorized when there is "marked interference with employment" such that the general rating schedule does not compensate for "average earning capacity impairment"). Moreover, although the two are not inextricably intertwined in all cases, a remand for further development and adjudication of TDIU can warrant remand on the issue of an extraschedular rating.[15] *See Brambley*, *supra*. This is because both are predicated on the veteran's complete disability picture, with a focus on occupational difficulties, although an award of TDIU involves a higher degree of occupational difficulty ("unemployability"). *Id*.

Accordingly, there should be no concern that the rating officials, Board, USB, or Director – all of whom assess the complete disability picture when evaluating TDIU – lack the ability to assess whether a disability picture arising from collective disabilities is exceptional or unusual as reflected by the governing norm of a marked interference on employment or frequent hospitalization, such that the schedule does not accord justice to the veteran. To the extent needed, I have every confidence that the Secretary and Board Chairman could provide the necessary training to accomplish the task.

In sum, although implementation impossibility can be a basis for rejecting the plain-language reading of the Secretary's regulation, this is not a case where implementation is impossible or so difficult as to be effectively impossible. *See Vermiglio v. Group Health Plan, Inc.*, No.

---

[15] In contrast, remand for development and adjudication of possible entitlement to an extraschedular evaluation generally does not warrant remand for TDIU. *Kellar v. Brown*, 6 Vet.App. 157, 162 (1994).

4:07ev0282TCM, 2008 WL 4402227, at *7 (E.D. Mo. 2008) ("[A]ny difficulty in implementing the regulation [does not] confer a different meaning than the one made plain by the language of the regulation."); *Abdel-Fattah v. Comm'r Internal Revenue*, 134 T.C. 190, 209 (2010) ("If the rule that Congress enacted . . . is problematic [or difficult to implement], then the problems can be addressed not by corrective interpretation but only by legislative amendment.").

*Challenging Final Decisions and Conflating Extraschedular Consideration and TDIU*

The Secretary's briefing also expressed concern that rejecting a narrow view of the authority delegated in § 3.321(b) might result in (1) numerous challenges to final decisions that have denied referral for an extraschedular evaluation under § 3.321(b) based on a misreading of the regulation and (2) extraschedular consideration under § 3.321(b)(1) being conflated with TDIU under § 4.16. As to the first contention, unappealed VA decisions generally are final unless (1) a claim is reopened by the submission of new and material evidence or (2) there is clear and unmistakable error (CUE) in the decision, which is demonstrated by a claimant's showing an undebatable error, the correction of which would manifestly change the outcome. *See, e.g., DiCarlo v. Nicholson*, 20 Vet.App. 52, 55 (2006) (noting that res judicata "requires that there be only one valid decision on any issue or claim" and that exceptions to the rule of finality include a motion for revision on the basis of CUE, Board reconsideration, Board correction of obvious errors sua sponte, and reopening the claim based on new and material evidence); *Russell v. Principi*, 3 Vet.App. 310, 313 (1992) (en banc) ("[c]lear and unmistakable error . . . must be the sort of error which, had it not been made, would have manifestly changed the outcome at the time it was made." (internal quotation marks omitted)).

Moreover, duty-to-assist failures, including the failure to properly develop a claim, do not constitute CUE, *see Szemraj v. Principi*, 357 F.3d 1370, 1375-76 (Fed. Cir. 2004) (failure to assist in developing evidentiary record cannot constitute CUE); *Cook v. Principi*, 318 F.3d 1334, 1341 (Fed. Cir. 2002) (breach of duty to assist cannot constitute CUE), and an award based on a reopened claimed has an effective date tied to the date of the claim to reopen, 38 U.S.C. § 5110(a); 38 C.F.R. § 3.400 (2012). Accordingly, the Secretary's concern that there would be numerous successful challenges to final decisions is unfounded. On the other hand, should the high standard of CUE be met or new and material evidence submitted, setting aside finality or reopening the claim would be

35

consistent with – indeed, in full compliance with – congressional direction, and, in that context, the justice envisioned by § 3.321(b)(1) would be accorded.

The Secretary's second contention – that a delegation of authority to the USB or Director to grant an extraschedular rating on a multiple-disability basis essentially conflates extraschedular consideration with TDIU – is a red herring. The regulations and caselaw are clear that TDIU and extraschedular evaluation consideration have separate criteria. Extraschedular consideration is available when a veteran's service-connected disabilities have, inter alia, a marked interference with employment such that the schedular ratings are not adequate, and TDIU is available when the veteran essentially is unemployable (i.e., "unable to secure or follow a substantially gainful occupation") as a result of his service-connected disabilities. *See Kellar*, 6 Vet.App. at 162; *Standon v. Brown*, 5 Vet.App. 563, 564-70 (1993) (issue of extraschedular evaluation is separate from issue of TDIU rating); 38 C.F.R. §§ 3.321(b), 4.16; *see also* 38 C.F.R. §§ 4.1, 4.2 (2012), 4.10 (2012).[16]

### *Application to the Present Case*

Mr. Johnson has multiple service-connected disabilities, including rheumatic heart disease and a right-knee disorder, for which he was denied referral for extraschedular consideration on an individual basis. The Board remanded a claim for an increase in disability compensation for his left knee because treatment records addressing Mr. Johnson's left knee were not previously considered by the VA RO, and the Board also remanded the issue of TDIU on a collective disability basis. In that context, and because 38 C.F.R. § 3.321(b) provides for extraschedular consideration on a collective, as well as individual, disability basis, the Board also should have remanded for further adjudication the issue of entitlement to an extraschedular evaluation on a collective disability basis. 38 U.S.C. § 7104(d)(1); *Allday v. Brown*, 7 Vet.App. 517, 527 (1995) (Board's statement "must be adequate to enable a claimant to understand the precise basis for the Board's decision, as well as to facilitate review in this Court"); *Schafrath v. Derwinski*, 1 Vet.App. 589 (1991) (Board must

---

[16] Of course, there are similarities in the criteria for each benefit, such that the record evidence in a case might, and frequently will, require discussion of both. *See Thun*, 22 Vet.App. at 117 (noting that marked interference with employment as required for extraschedular consideration is a lesser standard to meet than TDIU, which refers to obtaining or retaining employment in general); *Brambley*, *supra*; *see also* VAGen. Coun. Prec. 6-1996 (Aug. 16, 1996) (recognizing the possibility that circumstances may require a discussion of both extraschedular consideration and entitlement to TDIU) (citing *Moyer v. Derwinski*, 2 Vet.App 289, 293 (1992)).

consider and discuss all applicable provisions of law and regulation where they are made "potentially applicable through the assertions and issues raised in the record").

The Board's error warrants either modification of the Board's decision to reflect a remand for the RO to consider referral for an extraschedular evaluation on a multiple-disability basis, or a remand of the matter so that the Board can modify its decision to reflect a remand for the RO to consider referral for an extraschedular evaluation on a multiple-disability basis. 38 U.S.C. § 7252 (Court can, inter alia, modify Board decisions).

## II. SECOND ERRONEOUS CONCLUSION

The majority find error in the fact that the Board did not "discuss whether the rating schedule criteria regarding instability and limitation of flexion or extension reasonably describe Mr. Johnson's right knee disability." *Ante* at 12. *Compare Thun*, 22 Vet.App. at 115 (discussing three steps for analyzing if referral for an extraschedular disability rating is warranted), *with Anderson v. Shinseki*, 22 Vet.App. 423, 427 (2009) (clarifying that, although the Court in *Thun* identified three "steps," they can be treated as necessary "elements" for an extraschedular rating). Although the majority also find no prejudice arising from this purported error, I raise the matter to note that there is no legal requirement that the Board address step one – or element one – of the *Thun/Anderson* analysis in order to provide the statutorily required reasons or bases for its decision. The legal requirements with regard to the Board's statement are that the Board (1) address the material issues raised by the appellant or reasonably raised by the evidence, *Robinson v. Peake*, 21 Vet.App. 545, 552 (2008), (2) explain its rejection of materially favorable evidence, *Thompson v. Gober*, 14 Vet.App. 187, 188 (2000), (3) discuss potentially applicable laws, *Schafrath*, *supra*, and (4) otherwise provide an explanation for its decision that is understandable and facilitative of judicial review, *Allday*, *supra*. To hold otherwise puts form over substance, and can exacerbate the "hamster wheel reputation of veterans law." *Massie v. Shinseki*, 25 Vet. App. 123, 128 (2011).

Pursuant to *Thun*, referral for an extraschedular disability rating is not warranted if the rating schedule contemplates the veteran's disability picture, which *Thun* refers to as step one. 22 Vet. App. at 115-16. However, referral also is not warranted if the veteran's disability picture is not exceptional

37

or unusual, with the governing norm being whether there is a marked interference with employment or frequent hospitalization, which *Thun* refers to as step two. *Id.*; *see also Anderson*, *supra* (noting that the steps are, in fact, elements); 38 C.F.R. § 3.321(b). Thus, although the majority purport to find error because the Board did not discuss *Thun*'s step one, their assertion of error is overstated, as evidenced by the fact they subsequently find no prejudice because Mr. Johnson did not demonstrate that the Board's analysis of *Thun*'s step two was in error – a finding the majority could not make if there was a legal or otherwise necessary reason to mandate discussion of *Thun* step one before rendering a decision on whether referral for extraschedular consideration is warranted. *See Sanchez-Benitez v. Principi*, 259 F.3d 1356, 1363 (Fed. Cir. 2001) (noting that "it is not the role of the Veterans Court" to find "on its own" that a disability was not "exceptional or unusual" under 38 C.F.R. § 3.321(b)(1)).

In sum, the Board's statement of reasons or bases for denying referral for extraschedular consideration on an individual disability basis for rheumatic heart disease and a right-knee disability is fully understandable and facilitative of judicial review, and comports with all legal requirements. *See Allday*, *supra*.

### III. CONCLUSION

Accordingly, I would modify the Board decision to reflect a remand for the RO to consider referral for an extraschedular evaluation on a multiple-disability basis, or set aside the Board decision and remand for the Board to modify its decision to reflect a remand for the RO to consider referral for an extraschedular evaluation on a multiple-disability basis. That part of the Board decision otherwise on appeal I would affirm.

DAVIS, *Judge*, with whom BARTLEY, *Judge*, joins, dissenting: While we agree with the very thorough and well-reasoned dissent of our colleague, the Chief Judge, in his analysis of 38 C.F.R. § 3.321(b), we write separately to emphasize that our dissent is grounded in the conviction that the language of § 3.321(b) unambiguously refutes the interpretation advanced by the Secretary. By employing the plural of the noun "disability," the plain and unambiguous meaning of this regulation allows certain VA officials, in "exceptional cases" when the rating schedule is otherwise

inadequate, to assess the impairment in earning capacity due to the collective effect of multiple service-connected disabilities. The regulation indicates that in the extraschedular assessment, it is necessary to consider the aggregate effect of service-connected disabilities–the "disability picture." The regulation's use of "disability picture" is critical because multiple disabilities may collectively affect earning capacity when each disability considered individually may not.

The clear directive of the unambiguous regulatory language must be given effect. *Lengerich v. Dep't of Interior*, 454 F.3d 1367, 1370 (Fed. Cir. 2006) (citing *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414-15, (1945) (focusing on the "plain words of the regulation" to ascertain the meaning of the regulation)); *Trilles v. West*, 13 Vet.App. 314, 321 (2000) (where language conveys a plain meaning the Court must give effect to that meaning); *see also Perrin v. United States*, 444 U.S. 37, 42 (1979) (interpretation guided by ordinary common meaning of words); *Tesoro Haw. Corp. v. United States*, 405 F.3d 1339, 1346 (Fed. Cir. 2005) (construing a regulation like a statute by "ascertaining its plain meaning"). Moreover, the Secretary's interpretation of his own regulation is not entitled to deference when, as in this case, it conflicts with the plain meaning and words of the regulation. *See Christensen v. Harris Cnty.*, 529 U.S. 576, 588 (2000) (granting deference to agency interpretation plainly contradicted by unambiguous regulatory language would be "to permit the agency, under the guise of interpreting a regulation, to create *de facto* a new regulation"); *Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 476 (1992) (affording no deference to agency interpretation when in conflict with unambiguous text); *Smith v. Brown*, 35 F.3d 1516, 1523 (Fed. Cir. 1994) (applying the rules of statutory interpretation to regulations); *DeLuca v. Brown*, 8 Vet.App 202, 207 (1995) (holding that VA interpretation of regulation conflicting with plain meaning not entitled to deference).

Not only is the regulatory language unambiguous, we fault the majority's assertion that the Secretary's "disability-by-disability interpretation of § 3.321(b)" is more "consistent with the statutory and regulatory scheme," *ante* at 9. *See Smith v. United States*, 508 U.S. 223 (1993) (language cannot be interpreted apart from context). The foundation principle for evaluating disabilities is to compensate for the average effect of service-connected disabilities on the ability to earn a living. *See* 38 C.F.R. § 4.1 (2012). The rating schedule addresses individual disabilities, and through a combined rating table it provides for combining multiple disability evaluations. 38 C.F.R.

39

§ 4.25 (2012) (combining disability ratings). Significantly, the evaluation process in addition requires that VA collectively evaluate service-connected disabilities to determine whether together they result in the inability to earn a living wage. 38 C.F.R. §§ 4.16 (2012) (providing total disability ratings based on unemployability (TDIU)). In 2005, approximately 220,000 veterans were receiving TDIU benefits, the award of which required collective evaluation. GAO, VA SHOULD IMPROVE ITS MANAGEMENT OF INDIVIDUAL UNEMPLOYABILITY BENEFITS BY STRENGTHENING CRITERIA, GUIDANCE, AND PROCEDURES 2, 41 (GAO-06-309, 2006). This number illustrates that the VA disability evaluation process frequently requires that it evaluate multiple disabilities collectively in a manner clearly beyond the application of fixed disability percentages for individual disabilities and tables for combining those percentages. Evaluating the cumulative effect of several service-connected disabilities together is therefore in no way outside the ability of VA raters and a "disability-by-disability interpretation of § 3.321(b)" is no more "consistent with the statutory and regulatory scheme," *ante* at 9, than the cumulative approach that is also extant in VA rating procedures via TDIU consideration.

The history of the regulation further clarifies that VA revised its regulation "to accord justice" in the "exceptional case" that presents an "exceptional or unusual disability picture," and allow certain VA officials to approve an extraschedular evaluation for "a disability or disabilities." 38 C.F.R. § 3.321(b)(1) (2012); General Rating Considerations, Exceptional Cases, 26 Fed. Reg. 1561, 1583 (Feb. 24, 1961) (codifying VA Regulation 1321 and adding language that an extraschedular rating could be awarded based on the service-connected "disability or disabilities") (subsequently codified at 38 C.F.R. § 3.321(b)).

In sum, the unambiguous language of the regulation provides that when the rating schedule is inadequate to evaluate a single service-connected disability or multiple service-connected disabilities, certain VA officials are authorized to approve an extraschedular evaluation that considers the veteran's complete disability picture. Such an evaluation may involve assessing the exceptional or unusual impact of each service-connected disability individually, but, according to

the regulation, it may also involve considering the collective interaction of multiple service-connected disabilities. We therefore respectfully dissent from the majority's affirmance of the Secretary's restrictive interpretation, which is contrary to the clear and unambiguous regulatory language.